

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0862-20

---

### ANTHONY RUFFINS, Appellant

### v.

### THE STATE OF TEXAS, Appellee

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRD COURT OF APPEALS
### COMAL COUNTY

---

MᴄCʟᴜʀᴇ, J., delivered the opinion of the court in which Kᴇʟʟᴇʀ, P.J., Hᴇʀᴠᴇʏ, Rɪᴄʜᴀʀᴅꜱᴏɴ, Nᴇᴡᴇʟʟ, Wᴀʟᴋᴇʀ, and Sʟᴀᴜɢʜᴛᴇʀ, JJ., joined. Yᴇᴀʀʏ, J., filed a concurring opinion. Kᴇᴇʟ, J., concurred.

## O P I N I O N

Appellant was convicted of aggravated robbery by a jury and sentenced to life imprisonment by the trial court. With respect to the testimony of an accomplice in fact, the trial court instructed the jury that it must find an accomplice in fact to be an accomplice beyond a reasonable doubt. The court of appeals determined that the reasonable doubt

portion of the accomplice-witness application paragraph in the jury charge was erroneous, and that Appellant suffered egregious harm from the error. We exercised our discretionary authority to review this decision, and now reverse.

BACKGROUND

On May 10, 2016, four men entered Timeless Ink, a two-story tattoo and piercing shop in New Braunfels. The plan to commit a robbery originated with Gustavo Trevino[1] ("Trevino") and Olanda Taylor ("Taylor"). Taylor's cousin owned Timeless Ink. With Trevino and Taylor, Appellant, Kenneth McMichael ("McMichael"), and Robert Ruffins (Appellant's relative, hereinafter, "Robert"), agreed to participate in the robbery.

On the day of the robbery, Trevino drove Appellant, Taylor, and McMichael from the Palms Apartments ("the Palms") in San Antonio to New Braunfels in Trevino's white Volvo. On the way to Timeless Ink, the group picked up Robert, stopped at Wal-Mart to get zip ties, and then parked in a lot nearby the tattoo parlor. Inside the Volvo, the group put on masks, gloves, and hats to conceal their identities. Trevino stayed in the car as Appellant, Taylor, McMichael, and Robert entered Timeless Ink. The eight surveillance cameras installed throughout the two-story building captured what occurred next.

Inside the shop, Sarah Zamora and her husband Anthony can be seen working a late-night shift upstairs. Anthony was working on a tattoo for one of their regular customers, Tony Hernandez, when Sarah heard someone enter the shop downstairs. When Sarah got to the top of the stairs to greet them, she saw Taylor standing on the steps pointing a gun

---

[1] Trevino testified regarding the offense and his role in facilitating the robbery.

in her direction. Sarah ran back into the room where Anthony was working on Tony's tattoo and said, "Anthony, gun." Taylor, Robert, and Appellant came upstairs and entered the room and told Sarah, Anthony, and Tony to put their hands up and get on the ground.

Anthony told Taylor to take whatever they wanted, but Taylor hit Anthony and knocked him to the ground, knocking him unconscious. Appellant stomped on Anthony's head. Then all four men repeatedly kicked Tony's head and hit his head with pistols before dragging him around the floor.

Appellant then kicked Sarah in the face, forced her downstairs by her hair, and commanded her to open the cash register. It was empty. Appellant then removed the shop's safe that was located next to the cash register, placed it in a bag, and took it. Appellant again grabbed Sarah by the hair, walked her halfway up the stairs, pointed the gun at her, and told her not to look at them or move until they left or they would kill her. Anthony, Sarah, and Tony's wallets and cell phones were taken in the robbery.

Detective Richard Groff with New Braunfels Police Department ("NBPD") observed the four suspects on the Timeless Ink surveillance video. The surveillance footage showed four black men wearing masks and gloves and carrying handguns. One man, later identified as Appellant, was wearing a white hat, another was wearing a dark shirt, the third individual was wearing shorts with a red stripe, and the fourth was wearing shorts with a white stripe. The footage also captured a unique tattoo on one of the suspect's arms which was identified at trial as belonging to McMichael.

Detective Groff tracked Tony and Sarah's stolen phones using the *Find My iPhone* application and learned the phones were located in San Antonio at the Palms Apartments.[2] Detective Groff sent a message through the app asking for whoever found the phones to call him. Shortly thereafter, a woman named Rosa Garcia called Detective Groff and he went to the Palms to meet her. Rosa and her son had Sarah and Anthony's cell phones. Rosa told the detective she received the phones from "Tazz Ruffins." Rosa showed Detective Groff "Tazz's" Facebook page.

NBPD Detective John Mahoney used the Facebook profile Detective Groff obtained for "Tazz," and identified "Tazz" as Olanda Taylor.[3] Detective Mahoney learned Taylor lived at the Palms. While speaking with sources at the Palms, Mahoney learned that an individual named David Hogarth was acquainted with some of the suspects. When Detective Mahoney went to the Palms to try to talk with Hogarth in person, he observed Hogarth standing with Appellant. Appellant quickly walked away and Detective Mahoney asked Hogarth to come with him to the San Antonio police station. Hogarth was reluctant, but he agreed to go and ultimately assisted in identifying the robbers based on the surveillance video screenshots.

---

[2] NBPD also located the stolen safe in a dumpster at the Palms.

[3] Detective Mahoney's social media search of Taylor also led him to the Facebook pages for Appellant and co-defendants Robert and McMichael. From these searches, Mahoney learned that Appellant's nickname was "Poohbear." When Officer Mahoney listened to the surveillance footage from the tattoo shop, he heard someone say, "Let's go, let's go, Poohbear" before a man in a white hat, later identified as Appellant, came down the stairs. The various Facebook pages of the suspects also showed pictures of Appellant alongside Robert and Taylor. In each photo, Appellant is wearing a white hat similar to the one in the surveillance footage.

Hogarth also told Mahoney that he, Trevino, and Taylor had gone to New Braunfels prior to the robbery and that Trevino and Taylor had discussed the robbery during the trip. Hogarth admitted that he was present during conversations in which Taylor, Robert, Appellant, and Trevino made plans to commit a robbery and that Appellant recruited McMichael to help. On the night of the offense, Hogarth saw McMichael, Trevino, Taylor, and Appellant drive off in a white Volvo. When Hogarth was shown a photo from the surveillance footage of the masked man in the white hat, Hogarth stated that he knew the man in the photo was Appellant because Appellant always wore that particular hat. When Hogarth was interviewed by police, he informed Detective Mahoney that Trevino had been telling Hogarth what to say to police. When Trevino was interviewed by police, he provided an alibi that Mahoney's investigation revealed to be false. Mahoney obtained a search warrant for Hogarth's phone that revealed text messages that confirmed Hogarth's account.

Detective Mahoney obtained surveillance footage from other businesses near Timeless Ink and observed a white, box-shaped vehicle with a distinctive side blinker traveling in the vicinity shortly before the robbery. Trevino's white Volvo matched the description of the vehicle Mahoney observed in the footage.

Detective Mahoney later interviewed Taylor regarding the Timeless Ink robbery. Taylor provided information to assist in the investigation, including identifying information for the other suspects. Detective Mahoney obtained arrest warrants for the remaining suspects, including Appellant, who denied involvement in the Timeless Ink

robbery and claimed he had an alibi. However, Appellant also made comments such as "if you say I did it, I did it. If you say that's me, it's me" and refused to provide any information that would enable the detectives to follow up on his alibi information. A search of Appellant's father's apartment at the Palms led to the discovery of a gun and a pair of gloves.

Co-defendant Trevino testified at Appellant's trial in exchange for the State's abstention from recommending punishment in his case. Trevino told the jury that he decided to commit robbery at his cousin's shop because he needed money. He testified that, before the robbery, he drove by the tattoo shop with Hogarth and co-defendant Taylor; that he discussed the possibility of the robbery; that Hogarth was not part of the plan; that Hogarth had merely overheard the conversation concerning the robbery between Trevino and Taylor; that Hogarth did not help anyone commit the robbery; and that he told Hogarth to get a lawyer and not talk to the police after the robbery. Trevino testified that he drove to the tattoo shop in his white Volvo with Appellant and codefendants Taylor, McMichael, and Robert. He further testified that the four passengers put on masks and gloves and had their guns ready. He confirmed that Appellant was wearing a white hat.

At trial, Appellant called an ex-girlfriend to testify that she had been dating Appellant for several years and that he was with her on the night of the robbery. She admitted, however, that Appellant had asked her to provide an alibi at trial. She never provided the alibi information to investigative authorities, despite the fact she knew he had been in custody for two years awaiting trial.

At the final charge conference, the trial court asked if the parties had any objections to the jury charge. Appellant's counsel asserted:

> [DEFENSE COUNSEL]: You know what, I just thought of something. I'm sorry, Judge. I still think that, with a question of fact, that the instruction "therefore, if you believe"—the application instruction, "therefore, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness"—in this case it would be David Hogarth—"was an accomplice or you have a reasonable doubt whether he was or was not as the term is defined in the foregoing instructions, then you cannot convict the Defendant upon the testimony of—unless you further believe that there is other evidence in the case outside of testimony of David Hogarth tending to connect the Defendant with the offense charged in the indictment." And then, "From the all the evidence, you must believe beyond a reasonable doubt that the Defendant is guilty"—
>
> . . . (bailiff reports presence of all twelve jurors returning from break)
>
> [DEFENSE COUNSEL]: —because there is nothing in the charge that gives them an instruction with respect to how they determine someone is an accomplice, and it has to be done with "if you have a reasonable doubt or not," in that respect.
>
> …
>
> COURT: And it says in there they have to find that he is an accomplice beyond a reasonable doubt.
>
> …
>
> [DEFENSE COUNSEL]: But I don't think there's been an instruction that they need to believe—when they consider accomplice, they have to agree beyond a reasonable doubt that he is an accomplice. I don't think that's in here.
>
> COURT: I thought it was.
>
> [DEFENSE COUNSEL]: Unless I'm wrong. I mean, I—let me see here. I don't—I don't see it.

[STATE]: "If you find beyond a reasonable doubt that David Hogarth is an accomplice to the crime of aggravated robbery, you must consider whether there is evidence corroborating the testimony of David Hogarth. The Defendant, Anthony Ruffins, cannot be convicted on the testimony of David Hogarth, unless that testimony is corroborated."

[DEFENSE COUNSEL]: I'm good.

COURT: Okay.

Ultimately, the charge contained an accomplice-as-a-matter-of-law instruction for Trevino and the accomplice-as-a-matter-of-fact instruction for Hogarth. After considering the evidence, the jury found Appellant guilty of aggravated robbery.

## COURT OF APPEALS

On appeal, Appellant argued, among other things[4], the charge regarding Hogarth was erroneous because it instructed the jury that it had to find Hogarth to be an accomplice beyond a reasonable doubt. TEX. CODE CRIM. PROC. art. 38.14. In response, the State argued that Appellant should be estopped from complaining about the instruction since it was Appellant who requested the jury be instructed that they had to determine whether Hogarth was an accomplice beyond a reasonable doubt.

As to estoppel, the Third Court of Appeals found that Appellant was not estopped from complaining on appeal because (1) Appellant was actually requesting "an instruction specifying that there must be evidence corroborating Hogarth's testimony if the jury had a reasonable doubt as to whether or not Hogarth was an accomplice," and (2) the instruction

---

[4] Appellant raised eleven grounds on appeal, asserting that the trial court erred by: including multiple errors in the jury charge, failing to grant his motion for new trial, making a deadly weapon finding in its judgment, and imposing more court costs than were authorized.

was already in the charge at the time of Appellant's objection, so Appellant could not have invited the error.

Next, the court below agreed with Appellant that the charge was erroneous and reversed. It concluded that "a proper accomplice instruction should inform the jury that if they have a reasonable doubt regarding whether or not the witness acted as an accomplice, then corroboration is necessary." *Ruffins v. State*, 613 S.W.3d 192, 195 (Tex. App.—Austin 2020, pet. granted). The court found that the charge "essentially inverts this requirement by only requiring corroboration if it is shown beyond a reasonable doubt that Hogarth is an accomplice." The court noted that, while Appellant failed to object to the instruction, he was egregiously harmed by the error.

Justice Baker concurred in the court's opinion but wrote separately to point out an additional error in the charge – the failure to instruct the jury that "it must determine whether or not Trevino and Hogarth's testimony was both true and showed [his] guilt before using the testimony to convict." Justice Baker found this omission "compounded the harm," and the charge errors "individually and in aggregate egregiously harmed" Appellant.

Justice Goodwin dissented. Assuming that the charge was erroneous, she concluded that the majority's harm analysis was problematic because, in its review of the facts, the majority placed itself "too far in the role of factfinder." She said that "at some point an appellate court crosses the line when it substitutes its own credibility assessments and fact determinations for those of the jury," and she feared that "that line has been crossed here."

She also stated that the Appellant "must have suffered some actual – rather than merely theoretical – harm." *Ruffins v. State*, 613 S.W.3d 192, 209-10 (Tex. App.—Austin 2020) (citing *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019); *Marshall v. State*, 479 S. W.3d 840, 843 (Tex. Crim. App. 2016). Here, the majority's conclusion "that the jury could have had a reasonable doubt regarding whether Hogarth was an accomplice" was a finding of "merely theoretical harm." Justice Goodwin also disagreed with Justice Baker's concurrence, concluding that "language in the accomplice-witness instruction directing the jury to first find the accomplice-witness testimony to be true is not required by law."

ANALYSIS

The majority's rationale is problematic on two points. First, its conclusion that defense counsel was actually requesting "an instruction specifying that there must be evidence corroborating Hogarth's testimony if the jury had a reasonable doubt as to whether or not Hogarth was an accomplice" is not supported by the record.

When Appellant first objected and requested a reasonable-doubt instruction, the trial court responded that a reasonable-doubt instruction was in the jury charge: "[I]t says in there they have to find that he is an accomplice beyond a reasonable doubt." However, counsel expressed that he did not think such an instruction was in the charge: "But I don't think there's been an instruction that they need to believe—when they consider accomplice, they have to agree beyond a reasonable doubt that he is an accomplice. I don't think that's in here." Once more, the trial judge indicated that he "thought it was." The instruction was

then read verbatim by the State, and defense counsel said, "I'm good." The State then informed the trial judge which page the instruction was on, and the judge said, "Yeah. Okay. I thought it was in there."

While defense counsel's initial statement did refer to the language "if you have a reasonable doubt or not," counsel later clarified that he wanted an instruction "that they need to believe—when they consider accomplice, they have to agree beyond a reasonable doubt that he is an accomplice." When he learned that this language was already in the charge, he stated, "I'm good." The appellate court's conclusion that defense counsel was actually requesting a different charge is unpersuasive.

Second, the appellate court erred when it insinuated that invited error is the sole form of estoppel. To the contrary, while Appellant might not have invited error since the instruction was already in the charge, invited error is only one form of estoppel. *See Deen v. State*, 509 S.W.3d 345, 348 (Tex. Crim. App. 2017) (stating "[e]stoppel is a flexible doctrine that takes many forms."). Under the more general principle of estoppel, "a party may be estopped from asserting a claim that is inconsistent with that party's prior conduct." *Arroyo v. State*, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003).

For example, in *State v. Yount*, 853 S.W.2d 6 (Tex. Crim. App. 1993), we held that Yount, who had been indicted for involuntary manslaughter but had requested and received a jury charge on the lesser-included offense of driving while intoxicated, was estopped from complaining that his conviction of that lesser-included offense was barred by limitations. We explained that "appellee cannot benefit from the lesser included offense

instruction and then attack his conviction of that lesser included offense on limitations grounds." *Id*. at 9.

Similarly, in *Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000), we held that Prystash, who had affirmatively requested that the trial court not submit to the jury one of the special issues statutorily required for capital sentencing, was estopped from arguing on appeal that the trial court erred in failing to submit the special issue. We explained that "we will not permit [an] appellant to complain of the trial court's deleting a jury charge as he requested." *Id*. at 532.

Likewise, in *Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007), Druery complained that the failure to include the lesser-included offense instruction in the jury charge amounted to fundamental error. Druery therefore was estopped from bringing such a claim because the record reflected that he "affirmatively advised the trial judge that he did not desire such a charge on the lesser-included offense," thereby inducing the error of which he complained. *Id*. at 506.

In *Woodard v. State*, 322 S.W.3d 648 (Tex. Crim. App. 2010), we held that Woodard could not complain for the first time on appeal that the trial court erred to instruct the jury on the unindicted conspiracy to commit aggravated robbery offense because he "had some responsibility for the jury instruction." *Id*. at 659. Specifically, Woodard helped prepare the charge, including the challenged instruction. We concluded that action was "a great deal more than just simply not objecting to the charge or just stating 'no objection' to the charge." *Id*.

Finally, in *Woodall v. State*, 336 S.W.3d 634, 646 (Tex. Crim. App. 2011), we held that Woodall was estopped from bringing a Confrontation Clause claim on appeal when he declined the court's invitation to bring the witness into court.

As in the above cases, judicial estoppel is implicated here. Regardless of whether Appellant invited the error, his present claim is "inconsistent" with his "prior conduct." *Arroyo*, 117 S.W.3d at 798. As in *Woodard*, Appellant "at the very least" had "some responsibility for the jury instruction," more than "just simply not objecting to the charge or just stating 'no objection' to the charge." *Id*. at 659. Instead, by taking issue with the reasonable doubt instruction that he specifically requested, Appellant is presently asserting an inconsistent position and would derive an unfair advantage if not estopped. More plainly, Appellant is taking advantage of his own wrong. *See Druery*, 225 S.W.3d at 506. Appellant accepted the reasonable doubt instruction. He did not remain silent on the issue, fail to object, state he had no objections to the charge, or withdraw his objection. Instead, he affirmatively communicated to the court that he was "good" with the instruction, thereby accepting the reasonable-doubt instruction in the court's jury charge. Appellant is therefore estopped from bringing this jury instruction complaint on appeal because by his objection, request for a reasonable-doubt instruction, and affirmative assent to the instruction, Appellant "at the very least" had "some responsibility" for the error of which he now complains. *Woodard*, 322 S.W.3d at 659.

CONCLUSION

The record reflects Appellant specifically asked the trial court to ensure that the jury be instructed they had to agree "beyond a reasonable doubt" that Hogarth was an accomplice. We hold that Appellant, once he stated "I'm good" with the instruction, is estopped from thereafter claiming that the instruction was improper. We reverse the judgment of the court of appeals and remand the case to that court to address Appellant's remaining points of error. We need not address the State's remaining issues.

Delivered: March 29, 2023

Publish